## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

JEFFREY J.,

Case No. 1:24-cv-12816

*Plaintiff,*

Patricia T. Morris
United States Magistrate Judge

*v.*

COMMISSIONER OF SOCIAL
SECURITY,

*Defendant.*

_____/

## MEMORANDUM OPINION AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 15)

## I.    CONCLUSION

For the reasons set forth below, Plaintiff's motion for summary judgment
(ECF No. 11) is **DENIED**, the Commissioner's motion for summary judgment (ECF
No. 15) is **GRANTED**, and the decision of the administrative law judge (ALJ) is
**AFFIRMED**.

## II.    ANALYSIS

### A.    Introduction and Procedural History

On November 16 and 17, 2020, Plaintiff filed a claim for Title II Disability
Insurance Benefits (DIB) and Title XVI Supplemental Security Income Benefits
(SSI), alleging he became disabled on April 1, 2020. (ECF No. 7, PageID.229.) The

Commissioner initially denied the application on January 13, 2022, and on reconsideration on June 24, 2022. (ECF No. 7, PageID.89, 109.) Plaintiff then requested a hearing before an ALJ, which was held on July 24, 2023. (ECF No. 7, PageID.60–86.) The ALJ issued a written decision on October 19, 2023, finding Plaintiff was not disabled. (ECF No. 7, PageID.37–54.) Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied his request on August 28, 2024. (ECF No. 7, PageID.24–26.)

Following the Appeals Council's denial of review, Plaintiff sought judicial review on October 24, 2024. (ECF No. 1). The parties consented to the Undersigned conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters. (ECF No. 9). The parties have since filed cross-motions for summary judgment for which briefing is complete. (ECF Nos. 11, 15, 16).

### B.    Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but

less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

## C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any.  If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.

> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.

> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s).  If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.

> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.

> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work.  If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled.  If [claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her residual functional capacity (RFC), which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled. (ECF No. 7, PageID.52). At step one, the ALJ found Plaintiff meets the insured status requirements through December 31, 2022, and that Plaintiff had not engaged in substantial gainful activity since July 1, 2016, the alleged onset date.

(ECF No. 7, PageID.42.) At step two, the ALJ found the following severe impairments: Meniere's disease and sensorineural hearing loss. (ECF No. 7, PageID.43–45.) The ALJ also found the following non-severe impairments: obesity, bipolar disorder, personality disorder, major depressive disorder, anxiety disorder, substance abuse, peripheral neuropathy, obstructive sleep apnea, syphilis, HIV, irritable bowel syndrome, and hyperlipidemia. (*Id.*)

At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.* at PageID.45–46). The ALJ found the medical evidence did not support listing-level severity for any physical impairment as no acceptable medical source had found an equivalent in severity to the criteria of any listed impairment. (*Id.*).

Next, the ALJ found Plaintiff had the RFC

> to perform a full range of work at all levels but with the following non-exertional limitations: He can frequently climb but must not use ladders, ropes, or scaffolds. The claimant must avoid dangerous, moving machinery and work at unprotected heights, but is capable of avoiding ordinary workplace hazards and able to tolerate a noise level of three/moderate, as defined by SCO.

(ECF No. 7, PageID.46.)

At step four, the ALJ found Plaintiff was able to perform past relevant work as a clerical worker (DOT 209.562-010 semi-skilled SVP 3/light but performed at sedentary), and home health aide (DOT 354.377-014 semi-skilled SVP 3/medium). (*Id.* at PageID.49). In addition, at step five, the ALJ found other jobs in the national

economy that Plaintiff could perform. (*Id.* at PageID.50–51). Specifically, the ALJ found Plaintiff could perform the requirements of a garment sorter (200,000 in the national economy), ticketer/labeler (800.000), and a router (137,000). (*Id.* at PageID.51–52.) The ALJ thus concluded Plaintiff was "not disabled." (ECF No. 7, PageID.52).

### E.   Administrative Record

Plaintiff raises several issues on appeal. Plaintiff argues that the "ALJ failed to properly evaluate the persuasive value of the medical source opinions resulting in an RFC assessment that was not based on substantial evidence or logical explanation." (ECF No. 11, PageID.2225–33.) Plaintiff also contends that the "ALJ failed to properly evaluate Plaintiff's subjective symptom testimony." (ECF No. 11, PageID.2233–36.) While the Court has reviewed the entire record, it will only summarize the evidence below as relevant to Plaintiff's issues on appeal.

### F.   Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B).  The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources.  An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

    (i)    A licensed or certified psychologist at the independent practice level; or

    (ii)    A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only.  For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021).  A medical source is

> an individual who is licensed as a healthcare worker by a State and
> working within the scope of practice permitted under State or Federal
> law, or an individual who is certified by a State as a speech-language
> pathologist or a school psychologist and acting within the scope of
> practice permitted under State or Federal law.

*Id.* § 404.1502(d).  In contrast, a nonmedical source is "a source of evidence who is

not a medical source."  *Id.* § 404.1502(e).  "This includes, but is not limited to:

(1) [the claimant];  (2) Educational personnel (for example, school teachers,

counselors, early intervention team members, developmental center workers, and

daycare center workers); (3) Public and private social welfare agency personnel; and

(4) Family members, caregivers, friends, neighbors, employers, and clergy."  *Id.*

The Social Security Administration (SSA) "will not defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from [the claimant's] medical

sources."  *Id.* § 404.1520c(a).  "The most important factors [the SSA] consider[s]

when evaluat[ing] the persuasiveness of medical opinions and prior administrative

medical findings are supportability (paragraph (c)(1) of this section) and consistency

(paragraph (c)(2) of this section)."  *Id.*  The SSA will consider several factors when

it contemplates "the medical opinion(s) and prior administrative medical findings"

in a case.  *Id.* § 404.1520c(c).

The first factor is "supportability."  For this factor, "[t]he more relevant the

objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion.  In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id.* § 404.1520c(c)(3).  This factor includes analysis of:

(i)     Length of the treatment relationship.  The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii)    Frequency of examinations.  The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii)   Purpose of the treatment relationship.  The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv)    Extent of the treatment relationship.  The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help

demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(v)    Examining relationship.  A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors."  These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding."  *Id.* § 404.1520c(c)(5).  Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."  *Id.*  Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative

medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative

medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate

determination about whether [the claimant is] disabled"; and "[s]tatements on issues

reserved to the Commissioner[,]" including

    (i)     Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;

    (ii)    Statements about whether or not [the claimant has] a severe impairment(s);

    (iii)   Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;

    (iv)   Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;

    (v)    Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

    (vi)   Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;

    (vii)   Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and

    (viii)  Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

    The regulations also provide that

[b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not

binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504. Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests),

electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The

SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

(vi)    Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)     The prescribed treatment would be cataract surgery for one eye,

when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)     The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G.     Argument and Analysis

#### 1.     Whether the ALJ failed to properly evaluate the medical source opinions when formulating the RFC

Plaintiff contends that the "ALJ failed to properly evaluate the persuasive value of the medical source opinions resulting in an RFC assessment that was not based on substantial evidence or logical explanation." (ECF No. 11, PageID.2225–33.) More specifically, Plaintiff argues that the ALJ did not articulate how he applied the supportability and consistency factors when evaluating the opinions of Sandra Muller, FNP and Leyda Ham, DO. (*Id.*) The defense counters that the ALJ properly evaluated the opinions for the required factors of supportability and consistency and that the ALJ's statement regarding whether these opinions were expressed in sympathy to Plaintiff "did not detract from the previously discussed evaluation of

the supportability and consistency factors." (ECF No. 15, PageID.2261–63.)

Both medical opinions concluded that Plaintiff is disabled. Sandra Muller, FNP, completed a HIV Infection Medical Assessment Form in December 2020, wherein she opined that Plaintiff would have "[m]arked difficulties in maintaining social functioning" and "[m]arked difficulties in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace" but that he did not have marked limitations in activities of daily living. (ECF No. 7, PageID.373.) Besides the checked boxes selecting the indicator diseases of syphilis or neurosyphilus, herpes simplex virus, hepatitis, conditions of the mucous membranes and diarrhea, the only manifestations listed were "neuropathy" and "hot flashs" [sic]. (ECF No. 7, PageID.371–73.) It was also noted that Plaintiff has drowsiness as a side effect from his medication. (ECF No. 7, PageID.373–74.) Ms. Muller also opined that Plaintiff would have workplace stress and would be unable to perform detailed or complicated tasks, strict deadlines, close interaction with coworkers/supervisors, fast paced tasks, and exposure to work hazards but would not have workplace stress that would prevent him from performing work with public contact or routine, repetitive tasks at a consistent pace. (ECF No. 7, PageID.374.) Ms. Muller estimated that Plaintiff could walk 4 city blocks without rest or severe pain, could sit and stand at one time for 30–45 minutes and then would have to sit, that Plaintiff could stand/walk less than 2 hours in an 8-hour workday, would need to take 10-minute

long unscheduled breaks 1–2 times during an average workday, could lift and carry less than 10 pounds frequently, 10 pounds occasionally, and could never carry 20 or 50 pounds. (ECF No. 7, PageID.374.) The opinion concluded that Plaintiff would not be limited to: be aware of normal hazards and take appropriate precautions; and respond appropriately to changes in a routine work setting. Plaintiff would be limited but could satisfactorily: interact appropriately with the general public; understand, remember and carry out very short and simple instructions; perform routine repetitive work at a consistent pace without an unreasonable number and length of rest periods; and deal with the stress of semiskilled and unskilled work. Plaintiff would be seriously limited but not precluded from: maintain attention for even simple, repetitive tasks; work in coordination with or proximity to others without being unduly distracted or distracting of coworkers; complete a normal workday and workweek without interruption from psychologically based symptoms; and deal with normal work stress of even routine, repetitive low stress jobs. Plaintiff would be unable to meet competitive standards as to his ability to accept instructions and respond appropriately to criticism from supervisors. (ECF No. 7, PageID.374.)

This opinion has some internal inconsistency. For example, NP Muller found that Plaintiff could satisfactorily remember and carry out very short and simple instructions and perform repetitive work at a consistent pace without an unreasonable number and length of rest periods yet also found that Plaintiff would

need to take 10-minute long unscheduled breaks 1–2 times daily during an average workday.

Dr. Ham completed another HIV Infection Medical Assessment Form in April of 2023. (ECF No. 7, PageID.2160–64.) The indicator diseases listed were the same as in 2020 and an additional manifestation of peripheral neuropathy was noted. (ECF No. 7, PageID.2162 ("transient, few minutes (not quantified)").) Dr. Ham noted side effects from medication that included drowsiness, muscle aches, headaches and nausea. (ECF No. 7, PageID.2162.) He opined that Plaintiff would "constantly" experience symptoms that would interfere with the attention and concentration needed to perform even simple work tasks during a typical workday. (*Id.*) Dr. Ham also opined that Plaintiff would have workplace stress and would be unable to perform routine, repetitive tasks at a consistent pace; detailed or complicated tasks, strict deadlines, close interaction with coworkers/supervisors, fast paced tasks, and exposure to work hazards. (ECF No. 7, PageID.2163.) Dr. Ham estimated that Plaintiff could walk 1 city block without rest or severe pain, could sit and stand at one time for 20 minutes and then would have to sit or walk, that Plaintiff could stand/walk less than 2 hours in an 8-hour workday, would need to take 10-minute long unscheduled breaks 4 times during an average workday, could lift and carry less than 10 pounds occasionally, 10 pounds occasionally, 20 pounds occasionally and could never carry 50 pounds. (ECF No. 7, PageID.2163.) Dr. Ham stated that

Plaintiff's ability to work at a regular job on a sustained basis would be limited by his "sudden episodes of depression and anxiety with loss of focus; sudden episodes of abdominal pain; flare-ups may require urgent medical appointment or ED visits." (ECF No. 7, PageID.2164.)

Dr. Ham concluded that Plaintiff would not be unlimited in any tasks. Dr. Ham surmised that Plaintiff would be limited but satisfactory as to his ability to interact appropriately with the general public; and understand, remember and carry out very short and simple instructions. (ECF No. 7, PageID.2164.) Plaintiff would be seriously limited but not precluded in his ability to: maintain attention for even simple, repetitive tasks; work in coordination with or proximity to others without being unduly distracted or distracting of coworkers; complete a normal workday and workweek without interruption from psychologically based symptoms; perform routine repetitive work at a consistent pace without an unreasonable number and length of rest periods; be aware of normal hazards and take appropriate precautions; respond appropriately to changes in a routine work setting; deal with normal work stress of even routine, repetitive low stress jobs; and deal with the stress of semiskilled and unskilled work. (ECF No. 7, PageID.2164.) Plaintiff would be unable to meet competitive standards as to his ability to accept instructions and respond appropriately to criticism from supervisors. (*Id*.)

Dr. Ham's opinion also appears internally inconsistent at times. For instance,

Dr, Ham found that Plaintiff's workplace stress would prevent him from being able to perform routine tasks at a consistent pace; however, he also finds that would be limited but satisfactory in his ability to understand, remember and carry out very short and simple instructions.

When evaluating medical opinions, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). An ALJ must explain his approach with respect to supportability and consistency. *Id*. § 404.1520c(b). Here, Plaintiff is arguing that the ALJ failed to adequately explain his reasoning for finding that NP Muller and Dr. Ham's opinions were inconsistent with the record.

Under the regulations, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2). RFC is an administrative finding; thus, the Commissioner is responsible for determining an individual's RFC. SSR 96-5p, 1996 WL 374183, at *1–*2. Therefore, "to require the ALJ to base her RFC on a physician's opinion, would, in effect, confer upon the [physician] the authority to make the determination or decision about whether an individual is under a disability." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719,

24

728 (6th Cir. 2013). It then follows that our Circuit has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Mokbel-Alijahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401-02 (6th Cir. 2018).

In the instant case, the ALJ found the opinions of NP Muller and Dr. Ham "unpersuasive because it appears the clinicians' [sic] relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to accept as true most, if not all, of what the claimant reported uncritically." (ECF No. 7, PageID.46.) The ALJ also expressed the "possibility [that] always exists that a clinician may express an opinion in an effort to assist a patient with whom he or she sympathizes" or when patients are "insistent and demanding in seeking supportive notes or reports from their clinicians." (ECF No. 7, PageID.46.) The ALJ also noted that "[w]hile it is difficult to confirm the presence of such motives, they are more likely in situations where the opinion in question departs substantially from the rest of the evidence of record, as in the current case." (ECF No. 7, PageID.46.) The ALJ also properly noted that the question of whether a claimant is disabled is an opinion reserved to the Commissioner. (ECF No. 7, PageID.46.)

The ALJ cites to numerous medical records indicating that Plaintiff's "mental status examinations were consistently within normal limits" and to the DDS physicians' conclusions that were supported by Plaintiff's self-reported abilities and

"the record in detail." (ECF No. 7, PageID.46–47.) The ALJ also summarized the medical records indicating that his physical examinations were normal. (*Id*.)

I therefore find that the ALJ adequately explained how he applied the supportability and consistency factors when making his conclusion regarding the medical opinions and that his findings are supported by substantial evidence. *Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *3 (6th Cir. Sept. 28, 2023) (affirming an ALJ's decision that discredited a medical opinion unsupported by office treatment notes and "largely unremarkable physical examinations, in which [the plaintiff] consistently displayed normal strength, reflexes, and gait.").

### 2.    Subjective Testimony

Plaintiff also contends that the "ALJ failed to properly evaluate Plaintiff's subjective symptom testimony." (ECF No. 11, PageID.2233–36.) The defendant responds that the ALJ properly considered how Plaintiff's testimony was not consistent with the medical evidence, physical examinations, course of treatment, medication, or daily activities, including Plaintiff's ability to live independently. (ECF No. 15, PageID.2265–67.)

Plaintiff testified that he is able to drive but worries about his arm falling asleep if he drives long distances. (ECF No. 7, PageID.63.) Plaintiff last worked in 2015 or 2016, in an office doing clerical work where he sat most of the workday. (*Id*.) He also worked as a home manager where he helped "oversee the process of

six individuals' daily needs of eating, changing their laundry -- I mean, their everyday daily living needs is what it was because I worked at the home." (ECF No. 7, PageID.63–64.) He also helped with bathing and dressing and did have to bear the weight of the individuals he helped when transferring them from one position to another. (ECF No. 7, PageID.64.) He also worked as an inventory manager for a cell phone company and that job required him to work on his feet most of the day and lift around 20 pounds. (ECF No. 7, PageID.65–66.) Plaintiff's work as a self-employed surveyor only lasted a few months because "the vertigo just kept taking over too much. I was sick all the time." (ECF No. 7, PageID.66–67.)

Plaintiff tried the Epley Maneuver but "It didn't help. It just made it worse because I was already dizzy and spinning and then I've got to get my head below my flat -- I've got to lay down flat with my head below it and then I have to sit up, holding my head." (ECF No. 7, PageID.68.) When asked what the medical profession then suggested for the vertigo, Plaintiff responded, "they said they would try to do injections in the ear -- a steroid injection in there, but then they said because I had Meniere's disease, that -- or not Meniere's, the meningitis one, I think I'm saying it right, as a child, that they can't prove how long I had it or when I had it so the injections wouldn't work for me." (ECF No. 7, PageID.69.) When asked whether his medications help, Plaintiff reported "I don't notice anything different, no." (ECF No. 7, PageID.69.) It was recommended that Plaintiff eat a low-sodium diet because

of excessive fluid in the inner ear. (*Id.*)

Plaintiff testified that he has daily episodes of vertigo, "it could be one time a day, it could be ten times a day where I have to stop." (ECF No. 7, PageID.70.) Plaintiff also "tire[s] out fast" and "can like lift something, but then I don't have longevity" from HIV medications but he is able to walk for "roughly" 30 minutes. (ECF No. 7, PageID.70–71.) Plaintiff is able to stand for "probably 10/15 minutes" and to sit for "10/15 minutes and I'm already moving around" because of his hands or arms going numb. (ECF No. 7, PageID.78.) Plaintiff takes naps but not regularly, *i.e.*, he does not have a set time or schedule. (ECF No. 7, PageID.71.) Plaintiff stated that "[a]t least twice a week" he has days where vertigo severely limits his activity. (ECF No. 7, PageID.71.) Plaintiff's vertigo spells last a "good 1/2-an-hour and maybe 45 minutes[.]" (ECF No. 7, PageID.79.) Plaintiff has not been treated for any knee issues in the past few years, no longer takes medication for IBS, uses a CPAP machine for sleep apnea but Plaintiff stated it does not help. (ECF No. 7, PageID.73–74.) Plaintiff also takes medications for mental health symptoms. (ECF No. 7, PageID.74.) The medications Plaintiff takes for HIV cause him to feel nauseous. (ECF No. 7, PageID.75.)

Plaintiff lives in a house and is able to climb stairs "slowly[.]" (ECF No. 7, PageID.76.) He is able to do laundry (on the first floor) and go shopping, although he usually rides a scooter/buggy car that the store has available. (ECF No. 7,

PageID.76–77.)

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility" as long as the assessment is supported by substantial evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *see also Saunders v. Kijakzi*, No. 20-cv-12210, 2022 WL 885838, at *3 (E.D. Mich. Mar. 25, 2022) ("'It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant'" (quoting *Rogers.*, 486 F.3d at 247)).

In the instant case, the ALJ did "not doubt the claimant's impairments limit him; however, the undersigned finds the restrictions in the adopted residual functional capacity finding adequately address those limitations." (ECF No. 7, PageID.48.) The ALJ cited to specific allegations of symptoms and to specific medical records, activities reported, and Plaintiff's reported ability to live independently, and concluded that they were inconsistent with the alleged *extent* of the symptoms. (ECF No. 7, PageID.47–49.) I therefore conclude that the ALJ properly evaluated Plaintiff's subjective symptom testimony and that his decision is supported by substantial evidence.

III.   **ORDER**

For these reasons, Plaintiff's motion (ECF No. 11) is **DENIED**, the

Commissioner's motion (ECF No. 15) is **GRANTED**, and the ALJ's decision is

**AFFIRMED**.

**IT IS SO ORDERED.**

Date: January 20, 2026                          S/PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge